# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**MICHAEL DAVID GORBITZ,**

        **Plaintiff,**

        **vs.**                                           **Civ. No. 17-739  KK**

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**

        **Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

    **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 15) filed December 20, 2017, in support of Plaintiff Michael David Gorbitz's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title XVI supplemental security income benefits.  On March 20, 2018, Plaintiff filed his Motion to Reverse and Remand For A Rehearing With Supporting Memorandum ("Motion").  (Doc. 22.)  The Commissioner filed a Response in opposition on May 17, 2018 (Doc. 25), and Plaintiff filed a Reply on July 5, 2018.  (Doc. 28.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Doc. 10.)

# I. Background and Procedural Record

Claimant Michael David Gorbitz ("Mr. Gorbitz") has a long history of mental impairments that prevent and/or interfere with, *inter alia*, his ability to drive, to live and function independently, to have friends, to attend post-secondary education, and to obtain and maintain employment. (Tr. 39, 43, 44, 48, 50-53, 59-61, 63, 194-96, 215-16, 249-50, 256-57, 272-74, 287-88. [2]) He was diagnosed with ADHD at age 4, and speech language delays in the second grade. (Tr. 256.) He attended special education throughout his primary and secondary education. (Tr. 185, 258, 272.) He has undergone three separate neuropsychological evaluations, all of which have resulted in psychiatric diagnoses, including ADHD, anxiety, depressive disorder, mood disorder, and cognitive disorder; and a medical diagnosis of brain trauma. (Tr. 263-66, 284-86, 297, 401.) Mr. Gorbitz completed high school in 2009, and worked briefly as a grocery store bagger and UPS loader. (Tr. 186, 201-05.) Mr. Gorbitz reported he stopped working on September 7, 2011, due to his medical conditions and "other reasons."[3] (Tr. 185.)

On July 26, 2013, Mr. Gorbitz filed an application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq. (Tr. 166-71.) Mr. Gorbitz alleges a disability onset date of January 1, 2013,[4] at age twenty-two because of brain injury, bipolar disorder, post-traumatic stress syndrome, mood disorder, and attention-deficit/hyperactivity disorder. (Tr. 11, 83, 184, 230.) Mr. Gorbitz's application was initially denied on November 26, 2013. (Tr. 69, 70-81, 96-99.) It was denied again at reconsideration on May 23, 2014. (Tr. 82,

---

[2] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 15) that was lodged with the Court on December 20, 2017.

[3] Mr. Gorbitz reported that "[h]is shift started at 4:30 in the morning and he had a wreck on his way to work after falling asleep. Michael has applied at other jobs but doesn't make it past the initial interview because he doesn't understand how to answer the questions they are asking him." (Tr. 185.)

[4] Mr. Gorbitz initially alleged, but later amended, December 15, 2011, as the onset date. (Tr. 181, 230.)

83-95, 105-09.)  On June 13, 2014, Mr. Gorbitz requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 111-13.)  The ALJ conducted a hearing on March 30, 2016.  (Tr. 26-68.) Mr. Gorbitz appeared in person at the hearing with attorney representative Michael Armstrong. (*Id.*)  The ALJ took testimony from Mr. Gorbitz (Tr. 31-47), his mother Kristen Gorbitz (Tr. 47-57), his father Michael Gorbitz, Sr. (Tr. 58-64), and an impartial vocational expert ("VE"), Karen Provine (Tr. 65-67).  On April 20, 2017, ALJ Ann Farris issued an unfavorable decision.  (Tr. 8-21.)  On May 16, 2017, the Appeals Council issued its decision denying Mr. Gorbitz's request for review and upholding the ALJ's final decision.  (Tr. 1-6.)  On July 14, 2017, Mr. Gorbitz timely filed a Complaint seeking judicial review of the Commissioner's final decision.  (Doc. 1.)

## II. Applicable Law

### A. Disability Determination Process

An individual is considered disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals).  The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

(1)    At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[5]  If the claimant is engaged in substantial gainful activity, he is not disabled regardless of his medical condition.

(2)    At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s).  If the claimant does not have an impairment(s) or

---

[5] Substantial work activity is work activity that involves doing significant physical or mental activities.  20 C.F.R. §§ 404.1572(a), 416.972(a).  Work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.  *Id.*  Gainful work activity is work activity that you do for pay or profit.  20 C.F.R. §§ 404.1572(b), 416.972(b).

combination of impairments that is severe and meets the duration requirement, he is not disabled.

(3)     At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement.  If so, a claimant is presumed disabled.

(4)     If, however, the claimant's impairments do not meet or equal in severity one of the listing described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform his "past relevant work."  Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work.  Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands.  A claimant who is capable of returning to past relevant work is not disabled.

(5)     If the claimant does not have the RFC to perform his past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience.  If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  The claimant has the initial burden of establishing a disability in the first four steps of this analysis.  *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n. 5, 96 L.Ed.2d 119 (1987).  The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy.  *Id.*  A finding that the claimant is disabled or not disabled at any point in the

five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

## B.   Standard of Review

This Court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Casias*, 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). A decision is based on substantial evidence where it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley*, 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

## III. Analysis

The ALJ made her decision that Mr. Gorbitz was not disabled at step five of the sequential evaluation. (Tr. 20-21.) Specifically, the ALJ determined that Mr. Gorbitz had not engaged in substantial gainful activity since his application date, July 26, 2013. (Tr. 13.) She found that

Mr. Gorbitz had severe impairments of cognitive disorder, attention-deficit/hyperactivity disorder (ADHD), mood disorder, and personality disorder with passive-aggressive and self-defeating features. (*Id.*) The ALJ, however, determined that Mr. Gorbitz's impairments did not meet or equal in severity one the listings described in Appendix 1 of the regulations. (Tr. 14-15.) As a result, the ALJ proceeded to step four and found that Mr. Gorbitz had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:

> he is limited to simple routine tasks with reasoning at level one, involving only occasional and superficial interactions with the general public. The claimant should not be required to work at a production-rate pace or perform tandem tasks such as an assembly job.

(Tr. 15.) The ALJ further concluded at step four that Mr. Gorbitz was not able to perform his past relevant work. (Tr. 20.) The ALJ determined at step five that considering Mr. Gorbitz's age, education, work experience, and RFC, that there were jobs that existed in significant numbers in the national economy that Mr. Gorbitz could perform and he was, therefore, not disabled. (Tr. 20-21.)

Mr. Gorbitz argues that the ALJ (1) improperly rejected the opinions of treating psychiatrist E. B. Hall, M.D.; and (2) failed to account for all the moderate limitations assessed by nonexamining State agency psychologists Cathy Simutis, Ph.D., and Charles F. Bridges, Ph.D. (Doc. 22 at 16-23.) Based on the medical and record evidence in this case, as more fully discussed below, the Court finds the ALJ's reasons provided for according limited weight to Dr. Hall's assessments are not supported by substantial evidence and that this case requires remand.

## A.    Relevant Evidence

### 1.    Edwin B. Hall, M.D.

The Administrative Record contains seventeen treatment notes from Edwin B. Hall, M.D., from February 12, 2010, through January 23, 2016.[6]  (Tr. 360, 361, 364, 366-67, 368-69, 378-81, 382-85, 386-89, 412-17, 418-23, 424-29, 430-35, 436-41, 442-46, 447-51, 452-56, 457-60.)

#### a.    2010 - 2012

From 2010 through 2012, Mr. Gorbitz saw Dr. Hall, or PA-C Belina Avner of Dr. Hall's office, a total of five times.  (Tr. 360, 361, 364, 366-67, 368-69.)  The treatment notes reflect Mr. Gorbitz's reports of irritability, increased emotional agitation, feelings of suicide, and depression.  (*Id.*)  In response, Dr. Hall, or PA-C Avner, adjusted Mr. Gorbitz's medications and refilled his prescribed medications.  (*Id.*)

#### b.    2013

In 2013, Mr. Gorbitz saw Dr. Hall four times following an incident on April 17, 2013, in which Mr. Gorbitz threatened his father with a knife, was arrested and charged with domestic violence, and subsequently evaluated at Kaseman Presbyterian ER for suicidal ideation (Tr. 299-304, 378-81, 382-85, 386-89, 457-60.)  The narrative portions of Dr. Hall's treatment notes related to the incident are largely garbled and confusing.  What is discernable, however, is that Dr. Hall intervened with law enforcement on Mr. Gorbitz's behalf to have him psychiatrically evaluated. (*Id.*)  Dr. Hall explained that Mr. Gorbitz "was off his medicine and noncompliant accidentally and went into a manic depressive episode."  (Tr. 386.)  Dr. Hall noted that Mr. Gorbitz was "developmental," had "mood swings," and was suicidal and homicidal.  (Tr. 376. 378-79.) Dr. Hall also noted that "Michael does not need to be treated in a jail or penal system he needs to

---

be adjudicated as psychiatrically incompetent to stand trial and that he basically needs to be treated as mental health facility and making and with outpatient." [Sic.] (Tr. 382, 386, 457.)

On April 20, 2013, on mental status exam, Dr. Hall noted that Mr. Gorbitz's mood and affect were sad, depressed and irritable; he had poor insight and impaired judgment; and his thought content was suicidal. (Tr. 380.) Dr. Hall indicated that all other aspects of Mr. Gorbitz's mental status exam were normal.[7] (*Id.*) Dr. Hall diagnosed unspecified episodic mood disorder and anxiety state, unspecified. (Tr. 381.) Dr. Hall added Zonegran to Mr. Gorbitz's medication therapy,[8] and indicated his goal was to restabilize Mr. Gorbitz on his medications. (*Id.*)

On April 27, 2013, Dr. Hall noted that Mr. Gorbitz was much improved on Zonegran. (Tr. 382.) Mr. Gorbitz reported moderate stress due to family, occupational, and health concerns. (*Id.*) On mental status exam, Dr. Hall noted that Mr. Gorbitz's mood and affect were sad, depressed, and irritable; his insight was poor and judgment impaired; and his thought content was suicidal. (Tr. 383.) All other aspects of Mr. Gorbitz's mental status exam were normal. (*Id.*) Dr. Hall diagnosed unspecified episodic mood disorder and anxiety state, unspecified. (Tr. 384.) Dr. Hall noted that Zonegran had really helped Mr. Gorbitz's mood and that he felt confident he could get Mr. Gorbitz back on track. (*Id.*) Dr. Hall planned to continue Mr. Gorbitz on his current medication regimen and to continue current psychotherapy focus.[9] (Tr. 385.)

On May 31, 2013, Dr. Hall again noted that Mr. Gorbitz was much improved on Zonegran. (Tr. 386.) Mr. Gorbitz reported moderate stress due to family, occupational and health concerns. (Tr. 387.) On mental status exam, Dr. Hall noted that Mr. Gorbitz's mood and affect were sad,

---

[7] Other aspects included appearance, behavior, speech, orientation, recent memory, remote memory, attention/concentration, language (naming), language (repeating phrase), gait/station, muscle strength, and muscle tone. (Tr. 380.)

[8] Mr. Gorbitz was also taking Tegretol and Seroquel. (Tr. 381.)

[9] Mr. Gorbitz was seeing Brett Nelson, MA, NCC, LPCC, for counseling. (Tr. 400, 401-02.)

depressed, and irritable; however, his thought process was goal directed, and his thought content was normal. (*Id.*) All other aspects of his mental status exam were normal. (*Id.*) Dr. Hall diagnosed unspecified episodic mood disorder and anxiety state, unspecified. (Tr. 388.) Dr. Hall planned to continue Mr. Gorbitz on his current medication regimen and to continue current psychotherapy focus. (Tr. 389.)

On October 29, 2013, Dr. Hall noted that Mr. Gorbitz was much improved on Zonegran, and had been stable since his medication change. (Tr. 457.) Mr. Gorbitz reported moderate stress due to family, occupational and health concerns. (Tr. 458.) On mental status exam, Dr. Hall noted that Mr. Gorbitz's mood and affect were sad, depressed, and irritable. (Tr. 458.) All other aspects of his mental status exam were normal. (*Id.*) Dr. Hall noted that Mr. Gorbitz's mood was stable, that he had had no outbursts of anger, and had no suicidal or homicidal thoughts. (Tr. 459.) Dr. Hall diagnosed unspecified episodic mood disorder and anxiety state, unspecified. (*Id.*) Dr. Hall planned to continue Mr. Gorbitz on his current medication regimen and psychotherapy focus. (Tr. 460.)

### c.  2014

On February 6, 2014, Dr. Hall completed a *Medical Assessment of Ability to Do Work-Related Activities (Mental)* on Mr. Gorbitz's behalf. (Tr. 406-07.) Dr. Hall assessed that Mr. Gorbitz had *moderate limitations* in his ability to (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) make simple work-related decisions; (5) complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods; (6) ask simple questions or request assistance; (7) accept instructions and respond appropriately to criticism from

supervisors; (8) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and (9) be aware of normal hazards and take adequate precautions. (*Id.*)

Dr. Hall assessed that Mr. Gorbitz had *marked limitations* in his ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods of time (*i.e.,* 2-hour segments); (4) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; (5) sustain an ordinary routine without special supervision; (6) work in coordination with/or proximity to others without being distracted by them; (7) interact appropriately with the general public; (8) get along with coworkers or peers without distracting them or exhibit behavioral extremes; (9) respond appropriately to changes in the work place; (10) travel in unfamiliar places or use public transportation; and (11) set realistic goals or make plans independently of others. (*Id.*) Dr. Hall based his assessment on Mr. Gorbitz's "severe mood disorder" and "ADHD - Untreated." (Tr. 407.)

On February 7, 2014, Dr. Hall also completed forms for Listing 12.04 *Affective Disorders* and 12.06 *Anxiety-Related Disorders*, and assessed that Mr. Gorbitz met the A, B and C criteria for both. (Tr. 409-410.) Dr. Hall assessed, *inter alia*, that Mr. Gorbitz had *marked restrictions* in his activities of daily living; *marked difficulties* in maintaining social functioning; *marked difficulties* in maintaining concentration, persistence and pace; and had experienced repeated episodes of decompensation, each for extended duration. (*Id.*)

Mr. Gorbitz saw Dr. Hall six times in 2014. (Tr. 424-29, 430-35, 436-41, 442-46, 447-51, 452-56.) On February 7, 2014, Mr. Gorbitz presented with complaints of sensitivity to smell. (Tr. 452.) Mr. Gorbitz reported no stressors. (*Id.*) On mental status exam, Dr. Hall indicated that Mr. Gorbitz's mood was anxious, but that all other aspects were normal. (*Id.*) Dr. Hall diagnosed

unspecified episodic mood disorder and anxiety state, unspecified. (Tr. 454.) Dr. Hall noted they discussed Mr. Gorbitz's disability paperwork, and Mr. Gorbitz's difficulties with employment. (Tr. 454-55.)

On March 7, 2014, April 11, 2014, and May 16, 2014, Mr. Gorbitz presented for follow up on mood disorder and anxiety medication. (Tr. 436-41, 442-46, 447-51.) Mr. Gorbitz reported moderate stress due to occupational concerns. (Tr. 437, 443, 448.) On May 16, 2014, Dr. Hall noted that Mr. Gorbitz's mood was anxious, but otherwise indicated normal mental status exams at each visit. (Tr. 438, 444, 449.) Dr. Hall's diagnoses were unspecified episodic mood disorder; anxiety state, unspecified; and ADHD without mention of hyperactivity. (Tr. 439, 445, 450.) Dr. Hall adjusted Mr. Gorbitz's medications to address Mr. Gorbitz's complaints regarding irritability, temper, and focus. (Tr. 440, 446, 451.)

On June 20, 2014, Mr. Gorbitz saw Dr. Hall for mood disorder and anxiety medication follow up. (Tr. 430.) Mr. Gorbitz reported moderate stress due to occupational concerns. (Tr. 431.) Dr. Hall indicated Mr. Gorbitz had a fearful/anxious affect, but his mental status exam was otherwise normal. (Tr. 432.) Dr. Hall noted that Mr. Gorbitz got a job at Hinkle Family Fun Center, but reported having trouble dealing with people and the public and was easily overwhelmed. (Tr. 433.) Dr. Hall's diagnoses were unspecified episodic mood disorder; anxiety state, unspecified; and ADHD without mention of hyperactivity. (Tr. 433.) Dr. Hall added a new medication. (Tr. 434.)

On November 13, 2014, Mr. Gorbitz presented for mood disorder and anxiety medication follow up. (Tr. 424.) Mr. Gorbitz complained of depression due to having lost his job. (*Id.*) Dr. Hall indicated that Mr. Gorbitz was anxious, but his mental status exam was otherwise normal. (Tr. 425-26.) Dr. Hall noted, *inter alia*, that Mr. Gorbitz reported being laid off from his job

because there were too many people, that he was never late for work and did not argue or complain, that he was saving money for an apartment and was ready to move out of his parents' home, and that he was motivated to leave his parents' home and discussed job opportunities. (Tr. 427.) Dr. Hall's diagnoses were unspecified episodic mood disorder; anxiety state, unspecified; and ADHD without mention of hyperactivity. (Tr. 427.) Dr. Hall added a new medication and instructed Mr. Gorbitz to continue with his current psychotherapy focus. (Tr. 428.)

### d. <u>2015</u>

Mr. Gorbitz saw Dr. Hall only once in 2015. On August 29, 2015, Mr. Gorbitz presented for mood disorder and anxiety medication follow up. (Tr. 418.) Mr. Gorbitz complained of depression because he was unemployed. (*Id.*) Dr. Hall indicated that Mr. Gorbitz's mood was anxious, but his mental status exam was otherwise normal. (Tr. 419-20.) Dr. Hall diagnosed unspecified episodic mood disorder; anxiety state, unspecified; and ADD without mention of hyperactivity. (Tr. 421.) Dr. Hall noted, *inter alia*, that Mr. Gorbitz's mood was great, that he was stable, and that he denied anger outbursts and suicidal ideation. (Tr. 421.) Dr. Hall planned to add a new medication and instructed Mr. Gorbitz to continue psychotherapy focus. (Tr. 422.)

### e. <u>2016</u>

Mr. Gorbitz saw Dr. Hall only once in 2016. Mr. Gorbitz presented to Dr. Hall on January 23, 2016, for mood disorder and anxiety medication follow up. (Tr. 412.) Mr. Gorbitz complained of depression because he was unemployed. (*Id.*) Dr. Hall indicated a normal mental status exam. (Tr. 413-14.) Dr. Hall diagnosed unspecified episodic mood disorder; anxiety state, unspecified; and ADD without mention of hyperactivity. (Tr. 415.) Dr. Hall noted, *inter alia*, that Mr. Gorbitz drove from the mountains, was doing well, his mood was stabilized, and that he denied

anger outbursts or suicidal ideation. (Tr. 415.) Dr. Hall planned to add a new medication and instructed Mr. Gorbitz to continue psychotherapy focus. (Tr. 416.)

On February 27, 2016, Dr. Hall completed a second *Medical Assessment of Ability To Do Work-Related Activities (Mental)* on Mr. Gorbitz's behalf. (Tr. 462-63.) Dr. Hall assessed that Mr. Gorbitz had *slight limitations* in ability to carry out very short and simple instructions. (Tr. 462.)

Dr. Hall assessed that Mr. Gorbitz had *moderate limitations* in his ability to (1) remember locations and work-like procedures; and (2) understand and remember very short and simple instructions; (3) make simple work-related decisions; (4) interact appropriately with the general public; and (5) respond appropriately to changes in the work place. (Tr. 462-63.)

Dr. Hall assessed that Mr. Gorbitz had *marked limitations* in his ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods of time (*i.e.,* 2-hour segments); (4) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; (5) sustain an ordinary routine without special supervision; (6) work in coordination with/or proximity to others without being distracted by them; (7) ask simple questions or request assistance; (8) accept instructions and respond appropriately to criticism from supervisors; (9) get along with coworkers or peers without distracting them or exhibit behavioral extremes; (10) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (11) be aware of normal hazards and take adequate precautions; (12) travel in unfamiliar places or use public transportation; and (13) set realistic goals or make plans independently of others. (*Id.*) Dr. Hall explained that Mr. Gorbitz was not able to hold a job, had "significant social interaction," and "r/o ASD." (*Id.*)

On February 27, 2016, Dr. Hall completed forms for Listing 12.04 *Affective Disorders* and 12.06 *Anxiety-Related Disorders*, and assessed that Mr. Gorbitz met the A, B and C criteria for both. (Tr. 464-65.) Dr. Hall assessed, *inter alia*, that Mr. Gorbitz had *marked restrictions* in his activities of daily living; *marked difficulties* in maintaining social functioning; *marked difficulties* in maintaining concentration, persistence and pace; and had experienced repeated episodes of decompensation, each for an extended duration. (*Id.*)

### 2. <u>Barbara Koltuska-Haskin, Ph.D.</u>

On January 24, January 31, February 1, and February 22, of 2013, on referral from Dr. Hall, Mr. Gorbitz presented for neuropsychological evaluations by Barbara Koltuska-Haskin, Ph.D. (Tr. 287-97.) Dr. Koltuska-Haskin summarized Mr. Gorbitz's presenting situation as follows:

> Michael Gorbitz is a 22-year-old right-handed Anglo male who has a long history of learning problems, attention/concentration problems, mood problems, and anxiety. His medical problems include a history of brain trauma in 2006 as a result of car accident and thyroid disease. He is single and has no children. He has a high school education and one semester of college. He reportedly stopped going to college because he lost interest. He reported a total of 7 months of employment at Smith's, other grocery stores and at UPS. He was referred for a neuropsychological evaluation by his psychiatrist, Dr. E. B. Hall, to assess his current level of cognitive and emotional functioning and to assist in treatment planning.

(Tr. 287.)

Dr. Koltuska-Haskin interviewed Mr. Gorbitz, took background information from Mr. Gorbitz's mother and grandmother, and reviewed Mr. Gorbitz's clinical record. (Tr. 287-91.) Dr. Koltuska-Haskin also administered several standardized tests, including, *inter alia*, the Mini-Mental State Exam, Wechsler Adult Intelligence Scale-IV, Wechsler Memory Scale-IV, Beck Depression Inventory, Beck Anxiety Inventory, ADHD Questionnaire, and Minnesota Multiphasic Personality Inventory. (Tr. 291-95.) Dr. Koltuska-Haskin observed that Mr. Gorbitz was alert, oriented, pleasant, and cooperative. (Tr. 290.) She also observed that his

attention/concentration and frustration tolerance abilities were compromised, he was impulsive, hyperactive, had difficulty expressing himself verbally, gave up easily on difficult tasks, required a great deal of prompting, and would forget instructions. (Tr. 290-91.) Dr. Koltuska-Haskin observed that Mr. Gorbitz's mood was depressed and anxious, and that he appeared to have very low self-esteem. (Tr. 291.) Dr. Koltuska-Haskin summarized as follows:

> [Mr. Gorbitz's] overall clinical presentation indicates cognitive problems primarily in the areas of attention/concentration, executive functioning, visual-spatial skills, nonverbal memory, and working memory. The etiology of his cognitive problems is probably related to his brain trauma. In addition to his cognitive problems, he has a great deal of difficulty in the area of emotional functioning. Generally, his overall clinical presentation is consistent with Mood Disorder with passive-aggressive and self-defeating traits. He may benefit from medication adjustment and he needs to attend therapy on a regular basis for a long time. He may also benefit from yoga and meditation classes. Michael was encouraged to return to school to continue his education. He was advised to contact Richard Jiron from CNM's Special Services Department in order to obtain special services that will help him achieve his educational goals. He may also benefit from a referral to DVR for vocational assessment and part-time job placement. If there are changes in his functioning, he should be re-evaluated.

(Tr. 296-97.) Dr. Koltuska-Haskin's Axis I diagnoses were Cognitive Disorder NOS; ADHD, combined type; and Mood Disorder due to general medical conditions (brain trauma), with anxiety. (Tr. 297.) Her Axis II diagnosis was Personality Disorder with passive-aggressive and self-defeating features. (*Id.*) She assessed a current GAF score of 45-50.[10] (*Id.*)

### 3. Brett Nelson, MA, NCC, LPCC

On March 22, 2013, Mr. Gorbitz presented to Brett Nelson, MA, NCC, LPCC, for counseling. (Tr. 401-02.) Mr. Gorbitz complained that he experienced difficulty functioning in

---

[10] The GAF is a subjective determination based on a scale of 100 to 1 of "clinician's judgment of the individual's overall level of functioning." *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 32. A GAF score of 41-50 indicates serious symptoms (*e.g.,* suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). *Id.* at 34.

several jobs and in his attempt at college.  (Tr. 401.)  He reported that he felt "like a loser" and had

disappointed his parents.  (*Id.*)  He told LPCC Nelson he had been in three car accidents.  (*Id.*)  Mr.

Gorbitz reported problems with anger, particularly toward his father; depression; low self-esteem;

low energy; loss of interest; suicidal ideation "every night since 16"; distraction; and

concentration.  (*Id.*)  LPCC Nelson's Axis I diagnoses at intake included Cognitive Disorder NOS,

Mood Disorder due to general medical condition (brain injuries from multiple concussions), and

ADHD, combined type.  (Tr. 401.)  He assigned a current GAF score of 55,[11] and 45-50 for the

last year.[12]  (Tr. 401.)

On November 16, 2013, Mr. Nelson summarized that he saw Mr. Gorbitz weekly from

March 2013 through June 2013, and then biweekly from July 2013 through November 2013.  (Tr.

402.)  All told, they had 20 counseling sessions.  (*Id.*)  Mr. Nelson indicated that Mr. Gorbitz

stopped having suicidal thoughts after beginning counseling.  (*Id.*)  In May 2013, Mr. Gorbitz

reported that he was "feeling much better, experiencing happiness and feeling motivated."  (*Id.*)

Mr. Nelson noted that Mr. Gorbitz reported that his compulsive video gaming was unhealthy and

that he was becoming more focused on goals for his future and had started helping around the

house.  (*Id.*)  Mr. Nelson noted that Mr. Gorbitz had done surprisingly well in managing his anger.

(*Id.*)  Mr. Nelson also noted that Mr. Gorbitz had started college in August and reported that he

liked his classes, liked being in school, and was doing well.  (*Id.*)  Mr. Nelson was helping

Mr. Gorbitz with strategies for memory, study skills and test-taking skills.  (*Id.*)  Mr. Nelson

---

[11] A GAF score of 51-60 indicates moderate symptoms (*e.g.,* flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.,* few friends, conflicts with peers or co-workers).  *Id.* at 34.

[12] *See* fn. 10, *supra*.

indicated that Mr. Gorbitz still struggled with self-confidence and was emotionally and socially immature. (*Id.*) Mr. Nelson opined that

> [o]verall, I think Mr. Gorbitz has some significant cognitive and social impairments in the areas of memory, impulsiveness, foreseeing consequences of behavior, communication, interpersonal relationships, emotional awareness, realism re goals, concentration and decision-making. At this time, I do not believe he is likely to be able to maintain employment in a job that would make him self-sufficient. What is encouraging is his progress with anger management and his engagement with school so far. If he is able to make good grades and stay in school, he has a chance to develop compensating skills for his cognitive impairment and social skills sufficient to be employable and self-sufficient by the time he graduates from college.

(Tr. 402.)

On March 15, 2014, LPCC Nelson prepared an updated report related to Mr. Gorbitz's treatment. (Tr. 400.) LPCC Nelson stated he had two subsequent counseling sessions with Mr. Gorbitz on December 13, 2013, and December 27, 2013, for a total of twenty-two sessions since his original intake on March 22, 2013. (*Id.*) As of December 27, 2013, he did not see any significant change in Mr. Gorbitz's mental health since his November 16, 2013, report, to indicate any change in his diagnoses or prognosis. (*Id.*) LPCC Nelson noted that Mr. Gorbitz reported having completed his finals and that they were "easy." (*Id.*) Mr. Gorbitz also reported that he wanted to keep focusing on school, that he was very excited about an upcoming Star Wars convention coming to Albuquerque, and that he continued to have no problems with anger toward his father. (*Id.*)

### 4. **Cathy Simutis, Ph.D.**

On November 20, 2013, nonexamining State agency medical consultant Cathy Simutis, Ph.D., reviewed the record evidence, including Dr. Hall's treatment notes, Dr. Koltuska-Haskin's neuropsychological exam report, and Mr. Gorbitz's reported functional limitations. (Tr. 75, 76-

79.)  Dr. Simutis prepared a PRTF[13] and rated Mr. Gorbitz's degree of limitation in the area of activities of daily living as mild; his difficulties in maintaining social functioning as moderate; and his difficulties in maintaining concentration, persistence or pace as mild.  (Tr. 75.)  Dr. Simutis also prepared a Mental Residual Functional Capacity Assessment.  (Tr. 76-78.)  She found that Mr. Gorbitz had *moderate limitations* in his ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) interact appropriately with the general public; and (4) accept instructions and respond appropriately to criticism from supervisors.  (Tr. 77-78.)  Based on her findings and explanation regarding her review of the record evidence, Dr. Simutis assessed that the "[r]ecords on file show the claimant can be reasonably expected to perform unskilled work."  (Tr. 78.)

### 5.  Charles F. Bridges, Ph.D.

On May 21, 2014, at reconsideration, nonexamining State agency psychological consultant Charles F. Bridges, Ph.D., reviewed the record evidence, including Dr. Hall's treatment notes, Dr. Koltuska-Haskin's neuropsychological exam report, and Mr. Gorbitz's reported functional limitations.  (Tr. 89, 90-93.)  Dr. Bridges prepared a PRTF and rated Mr. Gorbitz's degree of limitation in the area of activities of daily living as mild; his difficulties in maintaining social functioning as moderate; and his difficulties in maintaining concentration, persistence or pace as mild.  (Tr. 89.)  Dr. Bridges also prepared a Mental Residual Functional Capacity Assessment. (Tr. 90-93.)  He found that Mr. Gorbitz had *moderate limitations* in his ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) interact appropriately

---

[13] "The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings.  The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."  SSR 96-8p, 1996 WL 374184, at *4.

with the general public; and (4) accept instructions and respond appropriately to criticism from supervisors. (*Id.*) Based on his findings and explanation regarding his review of the record evidence, Dr. Bridges affirmed Dr. Simutis's assessment that the "[r]ecords on file show the claimant can be reasonably expected to perform unskilled work." (Tr. 93.)

## B. The ALJ's Reasons for According Dr. Hall's Opinions Limited Weight Are Not Supported by Substantial Evidence In Light of the Record as a Whole

Mr. Gorbitz argues that the ALJ failed to follow the treating physician rule in weighing Dr. Hall's opinions, and that the reasons she provided for according them limited weight are either not legitimate or unsupported. (Doc. 22 at 17-19.) Mr. Gorbitz also argues that the ALJ failed to take into account several of the regulatory factors that would have weighed in favor of according more weight to Dr. Hall's opinions, such as his area of specialty, the length of his treating relationship with Mr. Gorbitz, and that his medical source statements were consistent. (*Id.* at 17-18.) Mr. Gorbitz further argues that the ALJ improperly discounted Dr. Hall's assessment because they were completed on "checklist-style forms" and "as an accommodation to Mr. Gorbitz." (*Id.* at 18-19.) The Commissioner contends the ALJ provided valid reasons and relied on substantial evidence for discounting Dr. Hall's restrictive opinions, and that the Court should affirm the ALJ's determination. (Doc. 25 at 10-14.)

"In deciding how much weight to give a treating source opinion, an ALJ must first determine whether the opinion qualifies for 'controlling weight.'" *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (quoting *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)). To do so, the ALJ must consider whether the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques." *Id.* If the answer is "no," the inquiry ends. *Id.* If the opinion is well supported, the ALJ must then determine if it is consistent with other substantial

evidence in the record. *Id.* If the opinion is deficient in either of these respects, the opinion is not entitled to controlling weight. *Id.* However, even if a treating physician's opinion is not entitled to controlling weight, it is still entitled to deference and must be weighed using the relevant regulatory factors.[14] *Id.* An ALJ need not articulate every factor; however, the ALJ's decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Ultimately, ALJs are required to weigh medical source opinions and to provide "appropriate *explanations* for accepting or rejecting such opinions." SSR 96-5p, 1996 WL 374183 at *5 (emphasis added); *see Keyes-Zachary v Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (citing 20 C.F.R. § 416.927(e)(2)(ii))).

It is undisputed that Dr. Hall is Mr. Gorbitz's treating physician with respect to his mental impairments. As such, the ALJ was required to apply the treating physician rule in evaluating his opinion. *Langley*, 373 F.3d at 1119. Here, at the first step of the treating physician rule, the ALJ failed to determine whether Dr. Hall's opinion qualified for controlling weight. This is error. *Id.* At the second step, in according limited weight to Dr. Hall's opinion, the ALJ provided explanations that are not supported by substantial evidence in light of the record as a whole. This is also error. *See Langley,* 373 F.3d at 1118 (a decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[.]").

In according limited weight to Dr. Hall's assessed limitations of Mr. Gorbitz's ability to do work-related mental activities, the ALJ explained that

> [t]hese checklist-style forms appear to have been completed as an accommodation
> to the claimant and include only conclusions regarding functional limitations

---

[14] These factors include the examining relationship, treatment relationship, length and frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist. *See* 20 C.F.R. § 416.927(c)(2)-(6) (evaluating opinion evidence for claims filed before March 27, 2017).

without any rationale for those conclusions. Moreover, these limitations appear inconsistent with Dr. Hall's own findings showing steady improvement, particularly in 2014, 2015, and 2016 (Exhibit 5F). For these reasons, these assessments were given limited weight.

(Tr. 18.) In according little weight to Dr. Hall's opinions that Mr. Gorbitz met the criteria for Listings 12.04 and 12.06, the ALJ explained that they were inconsistent with other medical evidence of record, including Dr. Hall's own treatment notes. (Tr. 19.) The ALJ went on to explain that

> [f]or example, Dr. Hall checked the box marked "repeated episodes of decompensation, each of extended duration" but the record shows only one episode of decompensation, that was not extended duration. Additionally, the extreme symptoms and limitations Dr. Hall indicates are completely at odds with treatment notes from the same period, showing the claimant was doing well, moving out of his parents' house, and looking for work (Exhibit 11F/5).

(Tr. 19.)[15]

As an initial matter, the ALJ's speculation that Dr. Hall completing the assessment forms as an accommodation to Mr. Gorbitz is not a proper basis for discounting a medical source opinion. *See Langley,* 373 F.3d at 1121 (rejecting as speculative the ALJ's conclusion that a medical report was simply an act of courtesy to a patient); *see also* 20 C.F.R. § 416.927(c) (setting forth appropriate factors for evaluating opinion evidence for claims filed before March 27, 2017). Further, case law addressing medical source opinions expressed on checkbox-style forms underscores that the critical question is whether the checkbox findings, either on the form itself or elsewhere in the record, are supported by substantial evidence. *See Anderson*, 319 F. App'x at 723-24 (finding that although the checklist forms completed by the treating physicians recorded

---

[15] At step three, the ALJ determined that Mr. Gorbitz had moderate limitations in his activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence and pace, and no episodes of decompensation for extended duration. (Tr. 14.) Mr. Gorbitz does not argue that the ALJ erred in her step three findings that Mr. Gorbitz does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, appendix 1. (Tr. 14-15.)

limited clinical comments, there were other materials that supported the conclusions in the forms, including cardiovascular medical reports, echocardiograms, and examination notes); *Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008) (holding that the magistrate judge incorrectly determined that it was unnecessary for the ALJ to discuss an examining source's opinion because it was presented on a checklist form where it was clear the physician examined the claimant, made notes or circled medical terms for her findings on the form at issue, and that the form was "clearly set up to record the results of a thorough physical examination"); *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987) (holding that evaluation forms, standing alone, unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence); *Fierro v. Colvin*, 2014 WL 12791246, at *4 (D.N.M. May 28, 2014) (rejecting the Commissioner's argument that the ALJ was entitled to reject a treating physician's opinion merely because it was provided on a checkbox form and finding that the opinion was supported by treatment notes, treatment plans, and other documentation).  Thus, while Dr. Hall's mere use of checkbox-style forms to assess Mr. Gorbitz's ability to do work-related mental functions does not provide a basis to discount his assessments, his assessments can be discounted if they are not supported by substantial evidence.  Here, as discussed below, Dr. Hall's assessments are supported by other medical record evidence and the ALJ's reasons for discounting Dr. Hall's assessments are not supported by substantial evidence.  *See* Section III.C, *infra.*  The ALJ erred in discounting Dr. Hall's assessments because they were prepared on checkbox-style forms.

The ALJ essentially discounted Dr. Hall's assessments based on her determination that the limitations assessed were inconsistent with his own treatment notes showing steady improvement. (Tr. 18.)  Elsewhere in the determination, the ALJ explained that Dr. Hall's treatment notes through 2016 demonstrated that Mr. Gorbitz's main stressors appeared to be unemployment and

living with his parents, and that at most of his appointments Mr. Gorbitz was noted to be doing well and having more motivation. (Tr. 17-18.) The ALJ also noted that Mr. Gorbitz's frequency of treatment with Dr. Hall decreased as his symptoms improved, and that when he takes his medication he "felt fine." (Tr. 18.) The ALJ further explained that Mr. Gorbitz returned to school in 2013, returned to work for a short period of time in 2014 where he reported to Dr. Hall that he was never late or argumentative, and that Mr. Gorbitz reported he was moving out of his parents' house. (Tr. 18-19.) Although Dr. Hall's treatment notes technically reflect these findings, *see* Section III.A.1., *supra*, the ALJ failed to view his treatment notes in the context of the entire record, and her explanations for discounting Dr. Hall's assessments are, therefore, not supported by substantial evidence.

Dr. Hall's treatment notes, and the record viewed as a whole, demonstrate that Mr. Gorbitz cannot function independently. For example, although noted, the ALJ minimized the fact that Mr. Gorbitz's mother had to drive Mr. Gorbitz to all of his appointments with Dr. Hall because Mr. Gorbitz's mental impairments prevented him from safely operating a motor vehicle.[16] The ALJ also minimized the fact that Mr. Gorbitz's mother attended Mr. Gorbitz's appointments with Dr. Hall because without her assistance Mr. Gorbitz was unable to effectively communicate his medical status to Dr. Hall, and unable to understand or follow Dr. Hall's course of treatment. When asked about this at the Administrative Hearing, Mr. Gorbitz testified that:

> Dr. Hall talks very fast, and I don't understand what he's saying most of the time. When I need new medicine, usually my mom is there because she remembers all of my medicine. I don't – you – she knows everything that – what the medicine does

---

[16] Mr. Gorbitz and his parents testified and/or reported that Mr. Gorbitz had not driven in two years due to his involvement in multiple accidents. (Tr. 50, 60-61, 196, 216, 288.) Mr. Gorbitz's mother testified that Mr. Gorbitz "has been in several automobile accidents where [he just] doesn't pay attention. One time, he fell asleep at the wheel. We bought him a moped. We thought maybe – maybe if he just had that it would work. And the last time he drove that, a truck was turning, and he drove right into the side of the truck. So he hasn't been driving since." (Tr. 50.) Mr. Gorbitz's mother reported to Dr. Koltuska-Haskin that the cost of insuring Mr. Gorbitz to drive was "too high." (Tr. 288.) Mr. Gorbitz's father testified that Mr. Gorbitz had been involved in three motor vehicle accidents, one of which led to a lawsuit. (Tr. 61.)

for me. And Dr. Hall writes it down for her, and then we get, like, a prescription. So when we're there, I just sit there. He asks me how am I doing or what's going on today. That's about it.

(Tr. 44.) Mr. Gorbitz's mother testified that

[h]e doesn't' know the medications that he's on. He doesn't know why he goes to see Dr. Hall. And if you ask him, he – when the doctor asks him how is everything going, he says everything's fine. I'm fine. It's great. And so, he can't explain to the Judge the problems he's having. He doesn't – he doesn't comprehend. He thinks everything's just great all the time.

(Tr. 51.) The record further supports that Mr. Gorbitz requires reminders to take his medications, and that if left on his own, he fails to do so; that he requires supervision to eat, to manage his personal and sleep hygiene, to dress properly, and to perform any household chores; and that despite his reported aspiration to move out of his parents' home, he has not done so because he does not have the means to support himself and requires regular supervision. (Tr. 39, 43, 51-53, 59-60, 194-195, 215.) In light of the record evidence as a whole, the ALJ's reliance on Dr. Hall's treatment notes indicating Mr. Gorbitz was "doing well" and steadily improving to demonstrate inconsistency with Dr. Hall's assessed limitations is misplaced. *See generally Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) (explaining that where the treating psychiatrist reported that the claimant was unable to work due to mental impairments while also noting that the claimant was "stable" may have simply meant that [the claimant] was not suicidal). As such, this explanation for discounting Dr. Hall's assessments is not supported by substantial evidence. *Langley,* 373 F.3d at 1118.

Additionally, the ALJ's reliance on Mr. Gorbitz's attending community college and briefly working during the relevant period of time to demonstrate that Dr. Hall's treatment notes were inconsistent with his assessed limitations is also not supported by substantial evidence in light of the record as a whole. It is undisputed that Mr. Gorbitz's attendance at community college was

brief, and that he did not return to school due to his mental impairments; *i.e.,* easily distracted, inability to concentrate or retain information, required one-on-one supervision and assistance to complete his homework, had to be driven to school. (Tr. 34, 41-42, 49-50.) It is also undisputed that although Mr. Gorbitz was able to secure jobs from time to time, he was unable to maintain any of them for longer than a few weeks. (Tr. 31-32, 56, 63, 249-50.) Moreover, his efforts to secure even part-time employment through the Department of Vocational Rehabilitation ("DVR"), at the encouragement of Dr. Koltuska-Haskin, were unsuccessful.

In addressing these issues at the Administrative Hearing, Mr. Gorbitz's father testified that they had tried to find a program for Mr. Gorbitz at CNM, but that "[i]t just didn't work. They would not follow up with him, would not give him any help." (Tr. 61.) As for securing a job with the help of DVR, Mr. Gorbitz's mother testified that

> [w]e thought we could get him some assistance [at DVR], and they – we – they tried to put him in a few jobs, but it – nothing worked out for him. And they wanted him to call a job coach, which he didn't know what to say, you know, to help him. He needs help filling out all of the applications when he applies, and he doesn't know – if you give him a paper and say you need to call the job coach so they can help you, he can't do it without my help.

(Tr. 48.) She further testified that she had taken Mr. Gorbitz to all of his job settings and helped him complete applications because he cannot do it on his own. (Tr. 55-56.) She testified that Mr. Gorbitz had tried everything from "fast food to loading planes and cargo containers to Smiths," but had been unable to retain any of those jobs. (Tr. 56.) Mr. Gorbitz's father further testified that

> [w]e have taken him to every job. Either we go online or we'll learn of a job that's available, set up – sit down with him, go through the forms, fill everything out with him, get him to the job. He'll get started, and about two or three weeks later, four at the max, they'll let him go [because he can't stay on task].

(Tr. 63.) The record demonstrates that Mr. Gorbitz was not successful in returning to school, nor was he able to maintain employment, and the ALJ's discounting of Dr. Hall's assessments on the

grounds that Mr. Gorbitz returned to college and briefly worked is not supported by substantial evidence and was improper in light of the record evidence. *Langley,* 373 F.3d at 1118.

## C.   The ALJ Failed to Properly Consider Medical Evidence That Was Consistent With Dr. Hall's Assessments

The ALJ failed to properly consider the medical evidence in the record that was consistent with the medical bases for and limitations Dr. Hall assessed. *See* 20 C.F.R. § 416.927(c)(4) (explaining that the more consistent a medical opinion is with the record as whole, the more weight we will give to that opinion). Here, the medical bases for Dr. Hall's assessments were consistent with Dr. Koltuska-Haskin's and LPCC Nelson's psychiatric diagnoses; *i.e.,* mood disorder, anxiety, cognitive disorder, and ADHD. (Tr. 297, 401, 407, 462-63.) Additionally, Dr. Hall's February 6, 2014, moderate and marked limitations were consistent with LPCC Nelson's November 16, 2013, assessment that Mr. Gorbitz was not likely "at [that] time" able to maintain employment based on his significant cognitive and social impairments.[17] (Tr. 402.) More significantly, LPCC Nelson conditioned any future employability on Mr. Gorbitz's ability to make good grades and stay in school, which Mr. Gorbitz was unable to do. (*Id.*) Finally, the medical evidence that predates the alleged onset date demonstrates Mr. Gorbitz's long history of mental impairments and is consistent with Dr. Hall's assessed marked limitations of Mr. Gorbitz's abilities in the areas of sustained concentration and persistence and social interaction.

On October 12, 2005, Richard Campbell, Ph.D., and Jacqueline G. Rea, M.A., of UNMH Center for Neuropsychological Services, conducted a neuropsychological evaluation of

---

[17] On November 16, 2013, LPCC Nelson assessed that "at this time" Mr. Gorbitz was not likely be able to maintain employment in a job that would make him self-sufficient. (Tr. 402.) The ALJ accorded LPCC Nelson's report limited weight. (Tr. 19.) She explained that LPCC Nelson was not an acceptable medical source, but that she considered his opinion with respect to severity and effect on function. (Tr. 19.) She explained that his opinion - that it was not likely at that time that Mr. Gorbitz could maintain employment in a job that would make him self-sufficient - was a determination reserved to the Commissioner, and was a blanket statement rather than specifying function-by-function abilities and limitations supported by specific clinical observations. (*Id.*)

Mr. Gorbitz when he was 14 years old on a referral from his pediatrician, due to concerns about a possible diagnosis of Asperger's disorder. (Tr. 256-71.) The evaluation documented Mr. Gorbitz's present concerns, developmental/medical history, and academic/social history. (*Id.*) Mr. Gorbitz's mother reported an ADHD diagnoses at age four, and that Mr. Gorbitz was, *inter alia*, disorganized, fidgety, easily overwhelmed and frustrated, and suffered "meltdowns" during which he cried. (Tr. 256-57.) The evaluators conducted a mental status exam and administered various standardized tests. (*Id.*) They observed that Mr. Gorbitz had difficulty organizing his thoughts, and had several problems with sustained attention, impulsivity, distractibility, and motor-overactivity. (Tr. 259.) In behavioral functioning, his teachers' responses indicated Mr. Gorbitz had significant difficulties with behavioral regulation (*i.e.,* inhibition, shifting, emotional control) and metacognition (*i.e.,* initiation, working memory, planning/organizing future tasks, organization of materials, and self-monitoring). (Tr. 262.) Standardized testing revealed that Mr. Gorbitz's general intellectual abilities were in the average range. (Tr. 263.) The evaluators concluded that

> [t]he overall pattern of results [was] indicative of mild impairment in generalized cortical abilities, including attention/concentration and cognitive flexibility. Parent and teacher questionnaires also indicated significant impairment in other areas of executive functioning including planning and organization. Neurocognitive test results are also suggestive of mild impairment in visual motor integration and mild lateralization of left-handed fine motor speed abilities[.]

(Tr. 263.) The evaluators ruled out a diagnosis of an autism spectrum disorder, including Asperger's Disorder. (Tr. 263.) However, the evaluators prepared a very lengthy list of specific recommendations and accommodations necessary to address Mr. Gorbitz's educational needs due to ADHD. (Tr. 264-65.)

Two years later, on November 14, 2007, Arsalan Darmal, M.D.,[18] of Amen Clinics, Inc., conducted an extensive child/teen evaluation of Mr. Gorbitz when he was 16 years old based on a referral from Dr. E. B. Hall. (Tr. 272-86.) Mr. Gorbitz's parents reported, *inter alia*, that in the last two years Mr. Gorbitz had become increasingly defiant and agitated with periods of rage,[19] and that in July 2006 claimant was involved in an automobile accident at which he was knocked unconscious by the airbag. (Tr. 273.) They reported that following the accident Mr. Gorbitz had become volatile and explosive, and experienced ongoing suicidal and homicidal ideation. (*Id.*) The evaluation documented Mr. Gorbitz's present concerns, medical history, psychiatric history, medication history, family history, and developmental history. (*Id.*) Dr. Darmal completed various questionnaires and checklists and performed two brain Single photon Emission Computed Tomography studies. (*Id.*) Dr. Darmal's psychiatric diagnoses included General Anxiety Disorder, Mood Disorder NOS, and ADD Inattentive Type. (Tr. 284.) Dr. Darmal's medical diagnosis included Brain Trauma. (*Id.*) Dr. Darmal recommended, *inter alia*, psychotherapy in combination with medications. (Tr. 286.)

The ALJ's only reference to the earlier medical evidence was to note that "[a]t the evaluations in 2005 and 2007, the claimant was noted to demonstrate a significant number of anxious and depressive symptoms, and symptoms consistent with ADHD." (*Id.*) The predated evidence, however, is particularly relevant here because it supports Dr. Hall's assessed marked limitations of Mr. Gorbitz's abilities in the areas of sustained concentration and persistence and social interaction. The ALJ's failure to more fully evaluate Dr. Hall's assessments in light of this

---

[18] Arsalan Darmal, M.D., is a Diplomate American Board of Psychiatry & Neurology, and Board-Certified Child, Adult and Adolescent Psychiatrist. (Tr. 286.)

[19] Mr. Gorbitz's parents reported that Mr. Gorbitz made homicidal comments during episodes of rage but had not reportedly acted on his threats. (Tr. 273.) They reported, however, that he was recently expelled from school in October 2007 as a result of an incident of rage. (*Id.*)

evidence, and given the severe limitations she assessed at step two, amounts to error because the regulations require the ALJ to "consider all evidence in [the] case record when [she] makes a determination or decision whether [claimant is] disabled," and is required to discuss "the significantly probative evidence [she] rejects." *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (quoting 20 C.F.R. § 416.920(a)(3)) (quoting 20 C.F.R. § 416.920(a)(3) and *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996)); *see also Hamlin v. Barnhart*, 365 F.3d 1208, 1223, n. 15 (10th Cir. 2004) (explaining that evidence from an earlier period are nonetheless part of the case and record and must be considered).

For all of the foregoing reasons, the ALJ failed to apply the correct legal standard in evaluating Dr. Hall's assessments, and her explanations for according his assessments limited weight are not supported by substantial evidence. This case, therefore, requires remand.

**D.    Remaining Issues**

The Court will not address Mr. Gorbitz's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand. *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

**IV.  Conclusion**

Mr. Gorbitz's Motion to Reverse and Remand for a Rehearing With Supporting Memorandum (Doc. 22) is **GRANTED.**

_____

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**